UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
In re:                              :
LEHMAN BROTHERS INC.                :
                                    :
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾             :
                                    :
FIRSTBANK PUERTO RICO               :
                                    :            16 Civ. 00069
        Appellant,                  :
                                    :            OPINION AND ORDER
        -v-                         :
                                    :
JAMES W. GIDDENS, as Trustee for the :
SIPA Liquidation of Lehman Brothers :
Inc.,                               :
                                    :
        Appellee.                   :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

FirstBank Puerto Rico ("FirstBank") appeals the decision of the
United States Bankruptcy Court for the Southern District of New York
(Chapman, B.J.), granting the motion of James W. Giddens, Trustee
for the SIPA Liquidation of Lehman Brothers Inc. ("the Trustee") to
expunge FirstBank's claim, and denying FirstBank's motion for
summary judgment. See A3556, A3571. FirstBank's claim sought
treatment as a "customer" within the meaning of the Securities
Investor Protection Act ("SIPA") and recovery of certain securities
or, in the alternative, the market value of these securities. See
A3147; A3556. The Court, in connection with FirstBank's appeal,
received briefing from appellant FirstBank, appellee Trustee, and
the Securities Investor Protection Corporation ("SIPC"), a party in

1

interest to this matter.[1] See Brief for Appellant ("FirstBank Br."),
Dkt. 11; Brief for the Appellee Trustee ("Trustee Br."), Dkt. 18;
Brief for Appellee Securities Investor Protection Corporation ("SIPC
Br."), Dkt. 16; Reply Brief for Appellant ("FirstBank Reply Br."),
Dkt. 19. Additionally, the Court heard oral argument on March 31,
2016. See Transcript dated March 31, 2016 ("Tr."), Dkt. 20. Having
considered the parties' submissions and arguments, the Court hereby
affirms the decision of the Bankruptcy Court.

The following is a basic outline of relevant facts, which are
undisputed unless otherwise indicated.[2] Until 2008, Lehman Brothers
Special Financing Inc. ("LBSF") was a wholly-owned special purpose
subsidiary of Lehman Brothers Inc. ("LBI"), which itself was a
wholly-owned subsidiary of Lehman Brothers Holdings Inc. ("LBHI").
See A2882-83. FirstBank is a commercial bank organized under the
laws of Puerto Rico. See A2884. In 1997, FirstBank entered into an
agreement with LBSF to make interest rate swap transactions. See
A2884. The agreement was governed by an International Swap Dealers
Association, Inc. Master Agreement and a Credit Support Annex, both
dated January 16, 1997 (collectively, the "Swap Agreement"). See

---

[1] "SIPC shall be deemed to be a party in interest as to all matters arising in a
liquidation proceeding, with the right to be heard on all such matters, and shall
be deemed to have intervened with respect to all such matters with the same force
and effect as if a petition for such purpose had been allowed by the court." 15
U.S.C. § 78eee(d).

[2] The facts bearing on this case have also been extensively documented in the
Bankruptcy Court's decision in the instant matter and in opinions rendered in
litigation between FirstBank and Barclays Capital Inc. See A3554; In re Lehman
Bros. Holding Inc., 492 B.R. 191 (Bankr. S.D.N.Y. 2013); In re Lehman Bros.
Holdings Inc., 526 B.R. 481 (S.D.N.Y. 2014), as corrected (Dec. 29, 2014), aff'd,
No. 15-149-BR, 2016 WL 1212079 (2d Cir. Mar. 29, 2016) (summary order).

A2885; A2911; A2968. The Swap Agreement required FirstBank to post collateral (the "Posted Collateral") to secure its obligations under the agreement. See A2968. Between 1999 and 2006, FirstBank posted as collateral 23 government securities issued by Fannie Mae and Ginnie Mae. See A2891.

LBI was not a party to the Swap Agreement between FirstBank and LBSF. See A2909, A2968. On May 16, 2002, LBI and LBSF entered into a Securities Account Control Agreement ("SACA"). See A2885. The SACA provided for LBI to receive collateral posted by LBSF counterparties (including FirstBank), to be placed in accounts "held in trust for the benefit of [LBSF]." See A2992. Pursuant to the SACA, FirstBank delivered the Posted Collateral to LBI, which held these securities in an account at JP Morgan Chase N.A. (the "Chase Account"). See A2885; FirstBank Br. at 8; Trustee Br. at 1, 7. In LBI's stock record, the name of the Chase Account holding the Posted Collateral was "FirstBank of Puerto Rico Pledge Account for LBSF." A2886.

In a series of transactions starting on October 3, 2007, LBSF sold most of the securities comprising the Posted Collateral to LBI pursuant to repurchase agreements. See A2889. LBI then transferred much of the Posted Collateral to Barclays Capital Inc. ("Barclays") as part of further repurchase transactions. See A2890. On September 15, 2008, LBI's parent company LBHI sought relief under Chapter 11 of the Bankruptcy Code. See A2882. On September 16, 2008, LBI and Barclays agreed to terminate their repurchase agreement as part of the sale of most of LBI's assets to Barclays – a transaction

3

approved by the Bankruptcy Court. See A2890. As a result of all
these events, 20 of the 23 securities posted by FirstBank as
collateral for its swap agreement with LBSF were transferred to
Barclays. See A2890-91; A3563; A3566 n.22; Trustee Br. at 5 n.2. The
other three securities had been "rehypothecated" (that is, re-used
in LBSF's financing transactions) to other LBSF counterparties, so
that as of the termination of LBI's repurchase agreement with
Barclays, LBI held none of the Posted Collateral. See A3563; A3566
n.22.

FirstBank did not file a claim for the Posted Collateral in the
Chapter 11 proceedings against its counterparty LBSF or against
LBHI, LBSF's guarantor. See A2893. However, FirstBank filed a
lawsuit against Barclays on December 21, 2009, seeking recovery of
the securities that FirstBank had posted as collateral. See A2893.
Additionally, on January 30, 2009, FirstBank timely filed a customer
claim (i.e., a claim to be treated as a "customer" within the
meaning of SIPA) against LBI, seeking return of the Posted
Collateral or, in the alternative, its market value. See A2893,
A3147. In the Barclays proceeding, Judge Peck of the Bankruptcy
Court ruled against FirstBank on May 10, 2013, and Judge Buchwald of
this Court upheld Judge Peck's ruling on December 18, 2014. See
A2893-94; In re Lehman Bros. Holding Inc., 492 B.R. 191 (Bankr.
S.D.N.Y. 2013); In re Lehman Bros. Holdings Inc., 526 B.R. 481
(S.D.N.Y. 2014), as corrected (Dec. 29, 2014). Judge Buchwald's
decision was affirmed by the Second Circuit in a summary order dated

March 29, 2016. See In re Lehman Bros. Holdings, Inc., No. 15-149-
BR, 2016 WL 1212079 (2d Cir. Mar. 29, 2016) (summary order).
Consequently, FirstBank has been unsuccessful in its quest to
recover the Posted Collateral from Barclays.

As for FirstBank's customer claim, which is at issue here, that
claim was denied by the Trustee on September 15, 2010 as duplicative
of a customer claim filed by LBSF. See A2893. FirstBank and the
Trustee then agreed to address the FirstBank customer claim through
a motion filed by the Trustee to expunge FirstBank's claim. See id.
On November 23, 2015, the Bankruptcy Court (Chapman, B.J.)[3] granted
the Trustee's motion for an order expunging FirstBank's claim and
denying FirstBank's motion for summary judgment. See A3556. First,
the Bankruptcy Court held that FirstBank was collaterally estopped
from pursuing its claim against LBI by the rulings of Judge Peck and
Judge Buchwald in the Barclays matter. See A3566-67. Second, the
Bankruptcy Court found that even if FirstBank were not collaterally
estopped in this manner, FirstBank was not a "customer" of LBI
within the meaning of SIPA and therefore could not pursue a customer
claim, See A3567-69. Third, the Bankruptcy Court stated that even if
FirstBank was a "customer" of LBI, FirstBank would not be entitled
to a customer claim, since LBI did not hold any Posted Collateral
when FirstBank filed its claim. See A3569. With respect to the third
ruling, the Bankruptcy Court stated that "customers" of a failed

---

[3] After Judge Peck retired from the bench, the case was transferred to Judge
Chapman on February 1, 2014. See A3555 n.1.

broker-dealer under SIPA are entitled to reimbursement on their "net equity" claims, but – according to the Bankruptcy Court - a "net equity" claim cannot be computed for accounts holding no securities or cash. See A3570.

The Bankruptcy Court therefore found in favor of the Trustee, and FirstBank appealed to this Court on January 6, 2016. See Notice of Appeal, Dkt. 1. The Court now affirms the Bankruptcy Court on the following basis. The Court finds that FirstBank was collaterally estopped by the rulings in the Barclays proceeding, and that even if FirstBank was not collaterally estopped, FirstBank was not a "customer" of LBI within the meaning of SIPA. The Court thus has no occasion to reach the Bankruptcy Court's third ruling that even if FirstBank were a "customer" of LBI, FirstBank would not have a viable customer claim.

"We review a Bankruptcy Court's factual findings for clear error and its legal conclusions de novo." O'Rourke v. United States, 587 F.3d 537, 540 (2d Cir. 2009). The Court therefore reviews the Bankruptcy Court's decision on collateral estoppel de novo. "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979). FirstBank contends, in support of its argument that collateral estoppel does not apply, that Judge Peck and Judge Buchwald in the Barclays proceeding indicated that

FirstBank's SIPA customer claim was not before them. See FirstBank Br. at 24. However, the relevant question – as FirstBank's counsel acknowledged at oral argument, see Tr. 3:3-17 – is not whether FirstBank's SIPA customer claim was before earlier courts, but whether these courts decided an issue that also resolves FirstBank's SIPA claim.

Here, the Court finds that the courts in the Barclays proceeding actually and necessarily decided the issue of whether FirstBank had an interest in the Posted Collateral after LBSF sold the securities to LBI, and that this issue disposes of FirstBank's SIPA claim. In particular, the district court ruled that:

> once [LBSF] sold the Collateral to [LBI] pursuant to FirstBank's Credit Support Annex, FirstBank lost all rights to the Collateral as against [LBI] (or any subsequent transferee). Instead, the Collateral became outright property of [LBI] and FirstBank retained only contractual rights against its own counterparties. . . . FirstBank's Credit Support Annex is clear that any permitted sale of the Collateral is "free" of FirstBank's interest. This includes a sale between two Lehman entities . . . Indeed, the Credit Support Annex contemplated that Lehman could unilaterally destroy FirstBank's interest in the Collateral without selling the Collateral in an arm's-length transaction.

In re Lehman Bros., 526 B.R. at 492-93. The Second Circuit, in affirming the district court's ruling in the Barclays suit, indicated that "[t]he Bankruptcy Court held, and the district court affirmed, that LBSF's sale of the securities that FirstBank initially posted as collateral to Lehman Brothers Inc. ("LBI") cut off FirstBank's interest in the collateral against LBI (or any subsequent transferee) pursuant to the International Swaps and

7

Derivatives Association Master Agreement and Credit Support Annex."
In re Lehman Bros., 2016 WL 1212079, at *1. If FirstBank's interest
in the Posted Collateral was cut off when its counterparty LBSF sold
the securities to LBI, such that "FirstBank retained only
contractual rights against its own counterparties," In re Lehman
Bros., 526 B.R. at 492, then FirstBank is not entitled to recover
these securities or their value from LBI, as it seeks to do in the
instant suit.

        FirstBank argues, however, that whereas the Barclays proceeding
concerned FirstBank's right to the securities that were ultimately
transferred to Barclays, the instant proceeding concerns FirstBank's
"customer" status under SIPA based on the securities positions in
LBI's records. See FirstBank Reply Br. at 10; Tr. 4:2-5:8. FirstBank
contends that LBI's stock record listed FirstBank's deposits of
securities collateral as long positions, credited to the Chase
Account to which FirstBank delivered securities. See FirstBank Br.
at 9; Tr. 5:2-5. Even if LBI at some point sold the underlying
securities, FirstBank argues, LBI remained liable to FirstBank on
the basis of the securities positions in LBI's records, and the
courts in the Barclays proceeding did not address the issue of
whether LBI was liable on this basis. See FirstBank Reply Br. at 10;
Tr. 4:12-25.

        As an initial matter, the Court doubts that FirstBank's
argument about securities positions is reflected in the language of
FirstBank's SIPA customer claim (filed January 30, 2009), which

sought a return of the securities that FirstBank posted as collateral or, in the alternative, their value. See A3147. Moreover, the Court finds that previous courts' rulings in the Barclays proceeding cover FirstBank's claim against LBI, whether or not this claim is based on securities or securities positions. These courts determined that FirstBank no longer had an interest in the collateral once LBSF sold the collateral to LBI, see In re Lehman Bros., 2016 WL 1212079, at *1, and that FirstBank could assert only contractual rights against its own counterparties, namely LBSF and its guarantor LBHI. See In re Lehman Bros., 526 B.R. at 492. Therefore, FirstBank cannot assert an interest that would entitle it to recover from LBI the securities or the value thereof. As a result, the Court affirms the Bankruptcy Court's decision that FirstBank is collaterally estopped from pursuing its claim against LBI in the instant suit.

Even if FirstBank were not collaterally estopped, however, FirstBank could not assert a customer claim against LBI because FirstBank does not count as a "customer" of LBI within the meaning of SIPA. See 15 U.S.C. § 78eee ("Protection of Customers"). The Court reviews the Bankruptcy Court's factual findings pertaining to this determination for clear error and the legal conclusions stemming from these factual findings de novo. See O'Rourke, 587 F.3d at 540.

The Securities Investor Protection Act of 1970 ("SIPA") "assures a minimum recovery to customers of insolvent brokerage

houses from a quasi-public fund." SEC v. Packer, Wilbur & Co., 498

F.2d 978, 980 (2d Cir. 1974). The Second Circuit has explained the

impetus for the passage of SIPA as follows:

> Congress enacted SIPA in 1970 in response to a business
> contraction [in the securities industry] that led to the
> failure or instability of a significant number of brokerage
> firms. . . . These failures sent shockwaves through the
> securities market as investors who had handed their assets
> over to broker-dealers suddenly lost access to their
> property. Existing bankruptcy safeguards did not adequately
> protect investors because investor assets were frequently
> commingled with the broker-dealer's other assets, and thus
> would be tied up for years in extended bankruptcy
> proceedings. . . . As more and more investors lost access
> to assets they had previously thought safe, the situation .
> . . threatened a "domino effect" involving otherwise solvent
> brokers that had substantial open transactions with firms
> that failed. . . . SIPA was designed to arrest this process,
> restore investor confidence in the capital markets, and
> upgrade the financial responsibility requirements for
> registered brokers and dealers.

CarVal UK Ltd. v. Giddens (In re Lehman Bros., Inc.), 791 F.3d 277,

280-81 (2d Cir. 2015) (internal citations and quotation marks

omitted). SIPA instituted the following procedures for the

liquidation of failed broker-dealers. "The trustee amasses customer

property and [e]ach customer shares ratably in this fund of assets

to the extent of the customer's net equity at the time of filing."

Id. at 281 (internal quotation marks omitted). "If this fund of

customer property is insufficient to make investors whole, the

trustee may dip into a special trust fund bankrolled by fees

assessed on the community of broker-dealers." Id. "This fund is

administered by the Securities Investor Protection Corporation

(SIPC)," id. at 281, "a nonprofit corporation consisting of all

broker-dealers and members of national securities exchanges."

Packer, 498 F.2d at 980.

As the foregoing discussion makes clear, the protections of

SIPA apply specifically to "customers" of eligible broker-dealers.

The version of SIPA applicable to this appeal, which incorporates

amendments made in 2000, provides the following definition of

"customer":

> The term "customer" of a debtor means any person (including
> any person with whom the debtor deals as principal or agent)
> who has a claim on account of securities received, acquired,
> or held by the debtor in the ordinary course of its business
> as a broker or dealer from or for the securities accounts
> of such person for safekeeping, with a view to sale, to
> cover consummated sales, pursuant to purchases, as
> collateral security, or for purposes of effecting transfer.
> The term "customer" includes any person who has a claim
> against the debtor arising out of sales or conversions of
> such securities . . .

15 U.S.C. § 78lll(2)(2000); see Addendum of Statutes and Regulations

Pursuant to Rule 8014(d) of the Federal Rules of Bankruptcy

Procedure, Dkt. 11-1.

The Second Circuit has stated that "[t]his court has ruled that

[j]udicial interpretations of 'customer' status support a narrow

interpretation of the SIPA's provisions." In re Bernard L. Madoff

Inv. Sec. LLC, 708 F.3d 422, 426 (2d Cir. 2013) (internal quotation

marks omitted); see also In re Klein, Maus & Shire, Inc., 301 B.R.

408, 418 (Bankr. S.D.N.Y. 2003) ("The courts have consistently taken

a restrictive view of the definition of a 'customer' under SIPA and,

accordingly, the burden is not easily met."). Moreover, the Second

Circuit has "identified the critical aspect of the 'customer'

11

definition to be the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." In re Madoff, 708 F.3d at 426 (internal quotation marks omitted).

In this case, the Court finds that FirstBank has failed to meet the requirements for customer status under SIPA. At the outset, the Court is not persuaded that LBI held securities "from or for the securities accounts" of FirstBank. See 15 U.S.C. § 78lll(2)(2000). The contractual arrangements between FirstBank and LBSF, and (separately) between LBSF and LBI, indicate that FirstBank did not have a "securities account" at LBI. Rather, the account at LBI set up to receive collateral posted by FirstBank was held for LBSF – as confirmed by the fact that this account was called "FirstBank of Puerto Rico Pledge Account for LBSF" (emphasis added). See A2886.

To elaborate, FirstBank entered into the Swap Agreement with LBSF, not with LBI. See A2910, A2968. The Swap Agreement provided that LBSF could "sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of [FirstBank]." See A2971. According to the Swap Agreement, while LBSF could appoint an "agent (a 'Custodian') to hold Posted Collateral" for LBSF, "[t]he holding of Posted Collateral by a Custodian will be deemed to be the holding of that

12

Posted Collateral by the Secured Party [i.e., LBSF] for which the Custodian is acting." A2971.[4]

Additionally, the separate contract between LBSF and LBI (the SACA), to which FirstBank was not a party, indicated that LBI would hold collateral posted by several LBSF counterparties, including FirstBank, "in trust for the benefit of [LBSF] as 'entitlement holder.'" See A2992. The SACA also stated that if LBI received an "entitlement order" or other instruction from LBSF, such as an order "directing the transfer . . . of any financial asset credited to any Account," LBI had to comply "without further consent by any Debtor [LBSF counterparty]," including FirstBank. See A2992-93, A3006. The SACA further provided that "[t]here are no other agreements entered into between [LBI] and any Debtor [including FirstBank] with respect to the Accounts," including the Chase Account to which FirstBank delivered securities. See A2992-94.

These arrangements make clear that the Chase Account was maintained, not for FirstBank, but for LBSF. Although FirstBank claims that LBI could have recognized both LBSF and FirstBank as beneficiaries of the Chase Account, see FirstBank Br. at 18, the applicable contracts provide that, as the Second Circuit put it, FirstBank's interest in the Posted Collateral was "cut off" when

---

[4] The parties dispute whether LBSF appointed LBI as a Custodian within the meaning of the Swap Agreement. See FirstBank Br. at 7; Trustee Br. at 6. However, as the Bankruptcy Court noted, whether or not LBI was formally appointed as a Custodian pursuant to the Swap Agreement, the agreement between LBSF and LBI (the SACA) provided that the accounts that LBI maintained to hold posted collateral (including the Chase Account) were "identified as held in trust for the benefit of [LBSF] as 'entitlement holder.'" See A2992, A3559.

13

LBSF sold the securities to LBI. See In re Lehman Bros., 2016 WL 1212079, at *1. Furthermore, while FirstBank argues that it maintained an interest in "securities positions" even if not in the underlying securities, see FirstBank Br. at 12, the Court sees no basis for this claim in the governing contracts, which unambiguously provide that LBI was holding the Posted Collateral on behalf of LBSF, which could use any Posted Collateral "free from any claim or right of any nature whatsoever of [FirstBank]." See A2971.

FirstBank nonetheless argues that the term "securities account" in SIPA's definition of "customer" should be defined in accordance with Article 8 of the New York Uniform Commercial Code ("UCC"), which defines "securities account" as follows:

> an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset.

New York UCC § 8-501(a). FirstBank further notes that "agreement" in this provision of the UCC "means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." New York UCC § 1-201(3); see also New York UCC § 8-501, cmt. 1. FirstBank cites various aspects of its dealings with LBI that, in FirstBank's view, show that LBI recognized

FirstBank as the owner of the long securities positions in the Chase Account.[5]

None of these arguments is persuasive. As an initial matter, FirstBank's attempt to displace the language of the governing contracts in favor of the UCC's definition of "securities account" is misguided. In fact, even one of the UCC provisions cited by FirstBank refers to "the bargain of the parties in fact as found in their language" in addition to other circumstances such as course of dealing. See New York UCC § 1-201(3). Moreover, under New York law, "[w]hen interpreting a contract, the intention of the parties should control, and the best evidence of intent is the contract itself." Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010) (internal quotation marks and alterations omitted). Here, as described above, the contracts governing the relationship between FirstBank and LBSF, and (separately) between LBSF and LBI, make clear that LBSF was entitled to use the Posted Collateral independent of any claim of FirstBank, and that the Chase Account at LBI was maintained for the benefit of LBSF, and not FirstBank. Further still, even if this Court were to apply the UCC definition

---

[5] For example, FirstBank maintains that LBI employees sent monthly statements to FirstBank reflecting LBI's recording of FirstBank's security deposits as long positions, that the Swap Agreement directed FirstBank to send notices under the contracts to "Lehman Brothers Inc.," and that FirstBank interacted with only LBI employees in connection with the Swap Agreement, since LBSF had no employees. See FirstBank Br. at 7, 19; A2553-54. While the Court does not view recourse to such "course of dealing" evidence as warranted, the Court notes that in any event these aspects of the relationship between FirstBank and LBI are fully compatible with the position that though LBI received deliveries of the securities from FirstBank pursuant to the SACA contract between LBSF and LBI, FirstBank did not have a "securities account" at LBI.

of "securities account," the Court would still find that LBSF, not
FirstBank, was "the person for whom the account is maintained." New
York UCC § 8-501(a). Consequently, the Court determines, as did the
Bankruptcy Court, that FirstBank had no "securities account" at LBI
within the meaning of SIPA.

Further reinforcing the conclusion that FirstBank does not meet
the requirements for customer status under SIPA is that FirstBank
cannot fulfill the standard for "entrustment" of its securities to
LBI. As the Second Circuit has held, "mere delivery is not
entrustment. Entrustment . . . must bear 'the indicia of the
fiduciary relationship between a broker and his public customer.'"
Car-Val UK Ltd. v. Giddens (In re Lehman Bros., Inc.), 791 F.3d 277,
283 (2d Cir. 2015) (citing SEC v. Baroff, 497 F.2d 280, 284 (2d Cir.
1974)). "[W]hat Baroff meant when it used the term entrustment," the
Second Circuit has stated, is "the customer handing assets over to a
broker-dealer so that the broker-dealer may do business on the
customer's behalf." Car-Val, 791 F.3d at 283.

In this case, FirstBank does not remotely meet the criteria for
entrustment endorsed by the Second Circuit. Though FirstBank
delivered securities to LBI, "mere delivery is not entrustment."
Car-Val, 791 F.3d at 283. Moreover, the agreements between FirstBank
and LBSF make clear that FirstBank had no legal claim to these
securities once LBSF sold them to LBI. See A2971. There is also no
indication that FirstBank "hand[ed] assets over to [LBI] so that
[LBI] may do business on [FirstBank's] behalf." Car-Val, 791 F.3d at

16

283. Furthermore, the relationship between FirstBank and LBI bore none of the "indicia of a fiduciary relationship" similar to the examples suggested in Car-Val: "1) selling the assets for the customer; (2) using the assets as collateral to make margin purchases of other securities for the customer; or (3) otherwise using the assets to facilitate securities trading by the customer." Id. (internal quotation marks omitted).

In fact, the Swap Agreement between FirstBank and LBSF provided that LBSF was "acting solely in the capacity of an arm's length contractual counterparty, with respect to this Agreement and any Transaction hereunder," and that LBSF was "not acting as a financial advisor or fiduciary of [FirstBank] (or in any similar capacity)." A2920. If there was no fiduciary relationship between FirstBank and LBSF – which was FirstBank's actual contractual counterparty – then there was certainly no fiduciary relationship between FirstBank and LBI, with which FirstBank had no contractual connection.

FirstBank attempts to avoid Car-Val's analysis of entrustment by pointing to a statement in Car-Val limiting its holding that a seller of securities pursuant to a repurchase agreement ("repo") was not a "customer" of the buyer within the meaning of SIPA. See FirstBank Br. at 20; Tr. 32:16-33:4. Specifically, the Car-Val court indicated that this holding applied to a "bilateral" repo, whereby "the seller delivers the assets to the buyer," and that the Second Circuit was not "decid[ing] how SIPA would treat assets retained by a repo participant as part of a hold-in-custody repo," which

"provide for the seller to maintain custody of the assets in a segregated account, even after selling the assets to the buyer." Car-Val, 791 F.3d at 279 n.1, 286 n.6.

FirstBank's argument, however, is unavailing. First, the entrustment requirement for "customer" status under SIPA did not, by any means, originate with Car-Val. See, e.g., Baroff, 497 F.2d at 283; Sec. Inv'r Prot. Corp. v. Executive Sec. Corp., 556 F.2d 98, 99 (2d Cir. 1977) (per curiam); In re New Times Sec. Servs., Inc., 463 F.3d 125, 128 (2d Cir. 2006); In re Madoff, 654 F.3d at 235-36. Second, Car-Val did not restrict its analysis of "customer" status under SIPA – including the crucial components of entrustment and "indicia of a fiduciary relationship" – to any particular species of repurchase transactions, or indeed, to any specific kind of transaction. Car-Val's analysis, applied to the context of the instant case, mandates the conclusion that FirstBank was not a "customer" of LBI within the meaning of SIPA and is therefore not entitled to make a SIPA claim.

For all these reasons, the Court affirms the decision of the Bankruptcy Court granting the Trustee's motion to expunge FirstBank's claim and denying FirstBank's motion for summary judgment. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated:   New York, NY
         July 7, 2016

JED S. RAKOFF, U.S.D.J.

18